SAMUEL EISEMAN & Co., INC., Respondent, *v.* JULIUS G.
KUGELMAN and MAX YANKAUER, Doing Business under
the Firm Name and Style of KUGELMAN, FRANKLAND &
FOREMAN, Appellants.

First Department, July 3, 1919.

**Sale — action for goods sold and delivered — allegation in answer
that goods were not sold to defendants — principal and agent —
failure to investigate authority of agent to pledge credit of princi-
pal — waiver of requirement by factors or commercial bankers
that they would not become personally liable unless a written
confirmation had been signed by member of firm — effect of
receipt of merchandise and filling out of unsigned confirmation
— when testimony as to conversation between agent and another
not binding on principal.**

In an action for goods sold and delivered the defendants pleaded a general
denial and alleged that the merchandise in question was not sold to them
but to one L. doing business under a firm name. It appeared that
defendants were factors or commercial bankers and leased a building
and furnished space therein to customers commonly known as consignors,
of whom L. was one; that an important part of defendants' business
consisted of advancing funds to consignors, but there was a rule of the
receiving department not to take any goods accompanied by invoices
charging the defendants unless a written confirmation had been signed
by a member of defendants' firm. In the case in question L., upon
being told by plaintiff's salesman that his firm would not pass the neces-
sary credit for the purchase of certain merchandise, said that he was
with the defendants and that the goods could be charged to them and
shipped to him. Plaintiff's salesman made no investigation as to the
authority of L. but at once invoiced and shipped the goods to him. When
the shipment reached the defendants' receiving department it was refused
and taken back to plaintiff's place. Thereupon defendants' creditman
had L. fill out a form of confirmation but it was never signed by a member
of defendants' firm. Said unsigned confirmation was left with defendants'
creditman and the goods subsequently received. The receipts produced
by the plaintiff showed the receipt of the merchandise by the defendants
for the account of L. The invoice mentioned both L. and the defendants.

*Held,* that since L. had never been held out by the defendants as authorized
to pledge their credit and since the transaction in question was the first
of its kind the plaintiff was under obligation to investigate the extent
of L.'s alleged authority, and not having so investigated it is charged
with all the knowledge that would have been revealed had an inquiry
been pursued.

The act of the defendants in receiving the invoice and the merchandise after its first refusal did not amount to a waiver of the rule requiring a signed confirmation, especially since according to the receipts taken the goods were received for the account of L.

It cannot be inferred merely from the receipt of the goods that defendants were put on inquiry which would have resulted in knowledge of the alleged sales to them.

Testimony as to conversations between L. and plaintiff's salesman was not binding on defendants, since no authority in L. was shown.

SMITH, J., dissented.

APPEAL by the defendants, Julius G. Kugelman and another, from a determination of the Appellate Term of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 10th day of February, 1919, affirming a judgment of the City Court of the City of New York, and also from the order of the City Court denying defendants' motion for a new trial.

*Francis M. Scott* of counsel [*Samuel J. Rawak,* attorney], for the appellants.

*Alfred L. Rose* of counsel [*Benjamin G. Paskus* with him on the brief; *Rose & Paskus,* attorneys], for the respondent.

PHILBIN, J.:

The complaint alleges goods sold and delivered. The answer is a general denial; more specifically, that the merchandise in question was not sold to the defendants but to one Abe Levin, doing business as the Imperial Silk Company.

In order to understand the situation fully, it will be helpful to indicate briefly the general way in which defendants carry on their business and then outline the happenings with reference to the particular merchandise involved in this suit.

Defendants call themselves factors. They facilitate purchases and sales by advancing funds on merchandise and accounts receivable and thus earn a commission. For that reason, they are sometimes called commission merchants; sometimes also called commercial bankers, which would seem to be a reasonably apt term to apply to the defendants in the present instance under the facts as disclosed by the record. They lease part of a large building and allot space therein to their various customers, who are commonly known

in the trade as consignors, of whom Levin was one. At the entrance to the building is a sign with defendants' firm name and also a statement thereon that they are factors for various concerns, listing them. This doubtless is done in order to comply with section 45 of the Personal Property Law (Consol. Laws, chap. 41 [Laws of 1909, chap. 45], as added by Laws of 1911, chap. 326). On the door of the space or office allotted to each consignor is another sign stating the name of that particular consignor and that defendants are his factors. The relationship between defendants and Levin was indicated to the public in that way.

The important part of defendants' business consists of advancing funds, but, incidental to that activity and doubtless for their better remuneration and protection, defendants also furnish various other services required in common by their consignors. For example, there is a general receiving department. Goods intended for a consignor are delivered to defendants and a receipt given. The goods are then forwarded to the particular consignor for whom intended. If the invoice comes to the defendants, it also is forwarded in like manner. The consignor checks the goods against the invoice, then stamps and signs a prescribed form of assignment to the defendants on the invoice and returns it to them. The legal effect of the assignment is to transfer the property in the goods to the defendants as security for advances, commissions and other charges. The consignor attends to the selling of the goods to his customers. The defendants attend to the making and forwarding of the invoices to such customers, and the invoices contain a notice that the accounts receivable, covering the merchandise billed, have been assigned to and are collectible only by the defendants. The latter furnish shipping facilities, or at least supervise shipments, for, as the merchandise is part of the security, the defendants naturally desire to retain physical control over the same. After the goods are shipped and the amounts of the invoices collected, defendants deduct their advances and commissions, also any other charges to which they may be entitled, and credit or remit the proceeds to the consignors. Sometimes the defendants guarantee the collection of the accounts receivable, and in such case an added or *del credere* commission is earned for

the additional risk. It is generally known that the goods of consignors are assigned (in the vernacular of the trade, " hocked ") to the defendants the minute received. For that reason, credit to the consignors is somewhat curtailed and sometimes even refused. In recognition of this state of affairs, the defendants have an arrangement whereby the consignors may sometimes purchase in the name of the defendants, but only under conditions hereinafter specified. The sellers are usually glad to sell direct to defendants and accord them more liberal terms of credit. Of course cases are bound to arise where either consignors or sellers attempt to charge the defendants as purchasers against their wishes. Accordingly, the defendants have instituted a system to protect themselves. All purchases made by consignors in the name of the defendants are subject to the written and signed confirmation of the defendants. It is a rule of the receiving department not to take in goods accompanied by invoices charging the defendants unless a written confirmation has been signed by a member of defendants' firm. If invoices, which attempt to charge the defendants, are received after delivery of the goods and no written confirmation has been signed, the same are at once turned over to defendants' credit man, whose duty it is to notify the seller immediately that defendants do not accept responsibility. Such is the system in operation in defendants' place of business.

We come now to an examination of the facts with regard to the particular transactions involved in this suit. As the verdict of the jury was in favor of the plaintiff, it will be necessary, in reciting the facts, to give the plaintiff the benefit of every dispute in the evidence. For convenience, plaintiff's assignors will be designated hereinafter as the plaintiff.

On or about March 22, 1917, Levin came to one Bernstein, plaintiff's salesman, and wanted to buy some merchandise, but was told that the office would not pass the necessary credit checks. Thereupon Levin said, " That is all right. I am with Kugelman, Frankland & Foreman. Charge the goods to them and ship to me." Levin also said that if plaintiff would follow that procedure he would see that defendants

accepted the goods on the condition that the same be charged to them. Bernstein made no investigation as to Levin's authority, but at once prepared a shipping ticket and an invoice and shipped the goods. On cross-examination, Bernstein admitted he knew Levin was in business for himself and that he bought the goods for himself. It is of little or no importance whether the goods were directed to the defendants or to Levin, for they were both located in the same building and, furthermore, it must be presumed that plaintiff followed the instructions received by Bernstein to *ship* to Levin. The important fact is whether the defendants consented to be *charged* with the goods. When the shipment reached the defendants' receiving department it was refused and taken back to plaintiff's place. Bernstein then telephoned Levin and told him of the refusal to take in the goods. Levin said he would call Bernstein back on the telephone in fifteen minutes. Levin went to one Huebschman, defendants' credit man, and explained the situation. Huebschman had Levin fill out a form of confirmation, as required by the terms of the written agreement between Levin and defendants. This confirmation was not at that time signed by a member of defendants' firm and there is no testimony that it ever was so signed. It was never delivered to the plaintiff. The unsigned confirmation was left with Huebschman, who told Levin that the goods would be received on redelivery. Levin then telephoned back to Bernstein and told him the matter had been straightened out and to deliver the goods a second time. That was done and the goods were received. The invoice mentioned both the Imperial Silk Company (Levin) and the defendants and was made out in the following form: " Sold to Kugelman, Frankland & Foreman * * * Shipped via Dept. Imperial Silk." The receipt for the goods was given by defendants' receiving clerk but is not in evidence. However, receipts for subsequent deliveries are in evidence and it is a fair inference that the receipt given for the first delivery is similar to the subsequent ones. The following is a type of the signature on the receipts: " Received * * * Kugelman, Frankland & Foreman, a/c I. S. Co., S. Friedman." The letters " I. S. Co." denominate the Imperial Silk Company or Levin. S. Friedman was defendants' receiving clerk.

The receipts, produced by plaintiff, therefore, show receipt of the merchandise by the defendants for the account of Levin.

On several subsequent dates, Levin again came to Bernstein and selected more goods and had similar conversations. Shipping tickets and invoices were made out in like manner. On more than one occasion subsequent to the first shipment, receipt of the goods was at first refused by the defendants and then, after intervening telephone talks between Bernstein and Levin and conversations between Levin and Huebschman and the filling out of confirmation forms by Levin, the goods were redelivered and received by the defendants for the account of Levin.

Under date of March 31, 1917, a credit memorandum against the invoice of March twenty-seventh was sent to the defendants. This memorandum made no mention of Levin or the Imperial Silk Company.

The invoice of March 23, 1917, for the first delivery together with other invoices for later deliveries, came into the hands of one Horn, purchase ledger clerk for the defendants, not later than April fifteenth. He noticed that the goods were charged to the defendants and finding no written confirmations for the purchases in defendants' name, at once turned the invoices over to Huebschman, whose duty it was, if the charges against the defendants were unauthorized, so to notify the plaintiff. Such notice was given on May 4, 1917, after the delivery of all the shipments involved in the action. On May 12, 1917, Levin failed in business.

The plaintiff claims that from the foregoing facts, the inference was properly drawn by the jury that the defendants ratified Levin's acts; that by receipt of the goods and invoices, the defendants did in fact accept the goods and agree to pay for them, as Levin said they would.

As Levin had never been held out by the defendants as authorized to pledge their credit, and as the transaction on March 22, 1917, was the first of its kind, it is clear that the plaintiff was under obligation to investigate the extent of Levin's alleged authority. Not having so investigated, plaintiff is charged with all the knowledge that would have been revealed had an inquiry been pursued. Even the most casual

investigation would have disclosed that Levin could not purchase in the name of the defendants unless a written confirmation of the purchase was signed by one of the defendants. The written agreement between defendants and Levin clearly defined the limits of his authority. No confirmation, signed or unsigned, ever came into the hands of the plaintiff and all the evidence establishes that while unsigned confirmation forms were submitted to Huebschman, none was ever in fact signed. Such being the case, the plaintiff cannot recover unless there was a waiver of such requirement. Upon first impression it might seem that the act of the defendants in receiving the merchandise, after its first refusal and Levin's conversation with Huebschman and the filling out of the *unsigned* confirmation forms, did amount to a waiver. However, as already pointed out, the very receipts taken by the plaintiff upon redelivery stated that the goods were received *for the account of Levin* — not for the account of defendants themselves. There was, therefore, no waiver, but rather a reiteration that defendants were not to be charged. The plaintiff had knowledge that the relation between the parties was that of commercial banker and customer and that incidental to that relation Levin occupied space in defendants' premises to which all goods purchased by him were delivered. It was the duty of defendants to receive such goods in the first instance and deliver them to Levin. Therefore, it cannot be inferred merely from the fact of the receipt of the goods that defendants were put on inquiry which would have resulted in knowledge of the alleged sales to them. Nor do I think the receipt of the invoices made out as above stated would have such effect, for the defendants knew that before any purchase by Levin could be charged against them, the confirmation to which reference has been made would have to be signed by a member of defendants' firm. The invoices might properly in ordinary course be made out to defendants, subject to such approval. It must be apparent that the two facts, the receipt of the invoices and the delivery of the goods, upon which plaintiff chiefly relies to show ratification by defendants, are not sufficient to justify that conclusion.

The testimony as to conversations between Levin and Bernstein was not binding on defendants, because no authority

in Levin was shown.   Defendants' rights in that regard were fully protected by proper objections and exceptions.

The determination of the Appellate Term and the judgment and order of the City Court should be reversed, and a new trial granted, with costs in all courts to the appellant to abide the event.

CLARKE, P. J., LAUGHLIN and MERRELL, JJ., concurred; SMITH, J., dissented.

Determination and judgment reversed and new trial ordered, with costs to appellant in all courts to abide event.